UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
TERENCE A. NELSON,

               Plaintiff,

     -against-

COUNTY OF SUFFOLK, DETECTIVE
WILLIAM HUDSON and DETECTIVE
RALPH RIVERA ,

               Defendants.
-------------------------------------------------------X

**MEMORANDUM & ORDER**

12-CV-5678 (DRH)(AKT)

**APPEARANCES:**

**For Plaintiff:**
Jacobs & Hazan, LLP
30 Vesey Street, 4th Floor
New York, New York 10007
By:   David M. Hazan, Esq.

**For Defendants:**
Dennis M. Brown
Suffolk County Attorney
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box. 6100
Hauppauge, New York 11788
By:   Arlene S. Zwilling, Esq.

**HURLEY, Senior District Judge:**

     At the conclusion of the trial of this matter, the jury returned a verdict in

favor of the plaintiff Terence Nelson ("Plaintiff" or "Nelson") and against defendants

Detective William Hudson ("Hudson") and Detective Ralph Rivera ("Rivera")

(together "Defendants") on each of the claims presented, viz. federal civil rights

claims for false arrest, malicious prosecution and denial of a fair trial/due process and state law claims for false arrest and malicious prosecution. The jury awarded Plaintiff total compensatory damages of $7,000.00 and $20,000.00 in punitive damages against Hudson and $30,000.00 in punitive damages against Rivera. Presently before the Court is Defendants' post-trial motion seeking judgment as a matter of law or a new trial, pursuant to Federal Rules of Civil Procedure 50(b) and 59. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

This case arises out of the detention and arrest of Plaintiff on November 17, 2011, and his arraignment the following day, after the Ultra Diamonds store at the Deer Park Tanger Outlet Mall reported to the Suffolk County Police Department that a 1 carat diamond bracelet which had been placed on a showcase by store employee Kassandra Messina ("Messina") was missing. That bracelet was found the next day, prior to plaintiff's arraignment, but the charges against him, grand larceny in the fourth degree, were not dismissed until his second appearance in court on November 23, 2011.

## I.     The Trial Testimony

On November 17, 2011, at approximately 10:50 a.m., Plaintiff, a frequent customer, arrived at the Ultra Diamonds store to have a diamond ring repaired that he had purchased there for his wife. While he was waiting for the repair order to be written up, he walked around the store looking at the displayed merchandise. At

that time store employee Messina was straightening out one of the display cases, taking items out of the case, putting them on a roll cart and then replacing them in the case. During that process she began speaking to herself loudly asking where is it and saying she misplaced something. After completing his business, Nelson left the store. Messina then reported to her supervisor that a diamond bracelet was missing; the police were thereafter notified. (Tr. 260, 277-79.)

Officer Lankewicz was the first police officer on the scene. The case was assigned to Hudson and Rivera, detectives with the Third Precinct, to investigate and Rivera went to the Ultra Diamonds store.

While at the store, Rivera took a statement from Messina in which she stated:

> Today . . . I was working at my store arranging some merchandise when a customer, Terrance Nelson, came in to drop off a repair. Terrence took the repair to Doreen. At this point I was moving jewelry from one display case to another. Terrence, who is a black male, came in with another black male who was on the phone hanging out by the registers. Terrence, while waiting for his repair, walked around the store a couple of times. Sometime around 11:04 a.m. I had placed a Modern Legacy 1ctw diamond bangle bracelet, SKU # 10056650, valued at $1,169.00 on top of the display case. I turned away from the display case to get a merchandise placard for it which was on a nearby rolling storage cart. I had turned away for a few seconds and when I turned back to the display case I noticed the bracelet was missing and Terrence Nelson was walking away from the counter. When I didn't see the piece I said "Where did the piece go, it didn't just walk off." "It's a big piece, it can't just disappear." Terrence said, "Is there something you want to say," "Is there something you want us to help you find." Terrence became verbally hostile because he thought I was leveling accusations at him. I went to the break room where we have our video to see if I could rewind it but I couldn't. Terrence was still in the store arguing with Doreen. I came back into the store and noticed that Terrence's pockets looked kind of funky. I didn't want the situation to get out of hand so I tried to calm Terrence down. I

> ultimately asked him to leave and he did. Terrence left the item that
> he wanted repaired here at the store. I called the police and filed a
> report for the theft of the bangle bracelet.
>  . . . .

(Pl.'s Ex. 2.) According to Messina, prior to Nelson leaving the store she was not

"concerned about the possibility that he had taken the bracelet." (Tr. 260.) Rather

she came to believe that he had stolen the bracelet "[a]fter watching [the video]

three to six times or so with three, one police officer and two detectives,[1] saying

they believe he took something in the case." "They believed he took an item from the

counter." "Rivera said it appeared from the video Mr. Nelson did take something

from the case. We would be unsure of what it was." (Tr. 262, 266.) Rivera admitted

that Messina never said she saw Nelson take the bracelet. (Tr. 201.) He also

admitted, while viewing the surveillance tape in court, that just prior to Nelson

passing by the counter where Messina was working, no jewelry was visible to either

Messina's left or right. (Tr. 207-08.) Nor did he see Nelson put anything in his

pocket. (Tr. 214.)

Sometime shortly after leaving the store, Nelson was informed by his wife

that Detectives were at the store looking for him. Based on that conversation,

Nelson decided to go to the police station to find out why they were looking for him.

(Tr. 279-80, 285-86.) When he arrived at the precinct, Rivera was still at the store

and Nelson, after waiting a period of time, eventually spoke to Hudson. (Tr. 287-88.)

Hudson found it "odd" that Nelson had come down to the precinct as in his

experience individuals that he is investigating do not usually just show up to speak

---

[1] A "tech detective" went to the store to copy the surveillance video. (Tr. 268.)

with him. (Tr. 110.) Nelson told Hudson that he did not steal anything. He insisted Hudson view the video, to which Hudson replied that Plaintiff should not give him ultimatums. Nelson was not free to leave the precinct because according to the officers at the precinct they were waiting for Rivera to return to the precinct after he completed his investigation at the jewelry store and that Rivera would decide whether Plaintiff would be formerly arrested. (Tr. 53-58, 287-89.)

After Rivera returned from the precinct, he spoke with Nelson and told him the video showed him taking the jewelry. (Tr. 216.) According to Nelson, Rivera accused him of having been drinking. (Tr. 290.)[2] Nelson was formerly arrested at about 6:00 p.m. and processed based on Rivera's description that Nelson could be seen on the video stealing the bracelet and his statement that Messina accused Nelson of stealing the bracelet from the store. (Tr. 61-66, 131-32, 289-94.) The paperwork sent to the District Attorney's office stated that Plaintiff was caught during the commission of a crime and described the evidence as "video/audio." (Pl.'s Ex. 15; Tr. 76.) Nelson spent the night locked up at the Third Precinct's holding room, which Nelson described as a jail. (Tr. 91-95, 294.)

At about 9:30 the following morning, while on their way to the Ultra Diamonds store, Hudson and Messina received a call from the precinct that Messina called and advised them that the bracelet at issue had been found. (Tr. 144-45.) They proceeded to the store and spoke to Messina. She was asked to give them a

---

[2] According to Nelson's wife, Hudson told her that his partner saw her husband taking jewelry. (Tr. 411.) She also testified that Hudson asked her if her husband was aggressive at home and if she was scared or intimidated by him; he told her that the precinct "is a safe place." (Tr. 416.)

statement but responded that she was the only employee in the store at the time and asked if she could come down later when she got off work; Defendants agreed to her request. (Tr. 146.) Messina went to the precinct about 4:30 p.m. and gave a follow-up statement indicating that the subject bracelet was not missing but had been placed in another permanent display area by another sales associate without her knowledge. (Pl.'s Ex. 3, Tr. at 167.)

Meanwhile, Nelson was taken to District Court at about 9:00 a.m. on November 18 but was the last person to be arraigned. The case was not dismissed; Nelson was formally arraigned on felony larceny charges and told to return on November 23. Between November 18 and November 23, no one called him to tell that the bracelet had been found and/or that the charges were going to be dismissed. On November 23, when he returned to court, the charges were dismissed. (Tr. 299- 305.)

## II.    The Jury's Verdict

Having heard three days of testimony, the jury returned a verdict in favor of Plaintiff. Specifically, the jury found in favor of Plaintiff on his federal § 1983 and state law claims for false arrest (1) against Hudson for the periods (a) beginning from the time Rivera returned from the Ultra Diamonds store to when the officers were informed that the missing bracelet had been found and (b) from that latter point until Nelson's arraignment and (2) against Rivera for the periods (a) beginning from the time Nelson arrived at the precinct until Rivera returned to the precinct from the Ultra Diamonds Store, (b) from Rivera's arrival at the precinct

until the officers were informed the bracelet had been found, and (c) from that latter point until Nelson's arraignment. The jury also found in Plaintiff's favor on his federal and state law claims for malicious prosecution, as well as his claims for denial of due process/fair trial and failure to intervene. Subsequent to their verdict, the jury answered special interrogatories posed to them at Defendants' request in connection with their claim for qualified immunity. The jury responded yes to the following two questions:

1. Have the defendants shown by a fair preponderance of the evidence that Kassandra Messina dictated the written statement dated November 17, 2011 to Detective Rivera?

2. Have the defendants shown by a fair preponderance of the evidence that Detective Rivera watched the security video on November 17, 2011?

The following questions were answered in the negative:

1. Have the defendants shown by a fair preponderance of the evidence that Detective Rivera placed a call to the Suffolk County District Attorney's Office on the morning of November 18, 2011 and advised them that the bracelet had been found?

2. Have the defendants shown by a fair preponderance of the evidence that the District Attorney's Office knew before the Plaintiff was arraigned that the bracelet had been found?

## II.    Legal Standard

### A.    Rule 50

Rule 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.' " *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1741 (2012) (quoting Fed. R. Civ. P. 50(a)(1)); *accord Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012).  The "burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash*, 654 F.3d at 333 (internal quotation marks omitted); *accord Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005). "Under such circumstances, the district court may set aside the verdict only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him." *Id.* (citations, alterations, and internal quotation marks omitted); *accord Stampf v. Long Island R. Co.*, 761 F.3d 192, 197-98 (2d Cir. 2014); *see also, e.g., Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (stating that a Rule 50 motion may be granted only if the court concludes that "a reasonable juror would have been compelled to accept the view of the moving party" (internal quotation marks omitted)).

In deciding a motion under Rule 50, the Court must disregard any evidence that weighs against the jury's verdict unless the jury was required to believe it. *Zellner*, 494 F.3d at 370 ("Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.') The question is whether, if credibility assessments are made against the moving party and all reasonable inferences are drawn against the moving party, a reasonable jury nevertheless would have no choice but to find in the movant's favor. *Zellner*, 494 F.3d at 370-71 (citing *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)). In other words the court may only grant a Rule 50 motion in this posture if there is " 'such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise or conjecture, or . . . [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [and women] could not arrive at a verdict against him.' " *Cross,* 417 F.3d at 247 (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992)). "Judgment as a matter of law on an issue as to which the movant bears the burden of proof is rare." *Broadnax v. City of New Haven*, 415 F.3d 265, 270 (2d Cir. 2005) (internal quotation omitted).

## B.     Rule 59

Federal Rule of Civil Procedure 59 provides that a Court may order a new trial "for any reason for which a new trial has heretofore been granted in an action

at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  The standard for granting a new trial under Rule 59(a) is less stringent than the standard for judgment as a matter of law under Rule 50.  *See, e.g., Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003).  Granting a new trial is appropriate where "the jury has reached a seriously erroneous result, or its verdict is a miscarriage of justice."  *Nimely v. City of N.Y.*, 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks and citations omitted). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).  But when "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) (internal quotations omitted); *see also  Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-19 (2d Cir. 2012) (noting that a district court judge "must exercise their ability to weigh credibility with caution and great restraint," and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury" (quoting *DLC Mgmt. Corp.*, 163 F.3d at 134, and *United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998)).

**DISCUSSION**

## I.    Defendants' Rule 50 Motion

### A.    Defendants' Contentions

In support of their Rule 50 motion, defendants argue that there was probably cause for arrest and therefore the claims for false arrest and malicious prosecution must fail. Alternatively, they assert they are protected by qualified immunity because there was, at a minimum, arguable probable cause. Defendants' also seek judgement in their favor on the § 1983 due process/fair trial claim as duplicative of the malicious prosecution claim and maintain there can be no claim for failure to intervene as Plaintiff claimed that the Defendants each personally violated his constitutional rights. Lastly, they argue that the verdict was against the weight of the evidence. (Defs.' Rev. Mem. at 10-19.) The Court will address each of these arguments in turn.

### B.    The Evidence Permitted the Jury to Find a Lack of Probable Cause

"Probable cause is a complete defense to a constitutional claim of false arrest, and continuing probable cause is a complete defense to a constitutional claim of malicious prosecution." *Oquendo v. City of New York*, 2019 WL 2323676, *1 (2d Cir. 2019) (quoting *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014). "Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable

caution in the belief that an offense has been or is being committed by the person to be arrested." *Id.* (quoting *Betts*, 751 F.3d at 82).

Defendants' argument that there was probable cause to arrest and prosecute Nelson is fairly summarized by the following excerpt from their memorandum:

> It was undisputed that Messina spoke with Det. Rivera about the alleged theft. She signed a sworn statement connecting Nelson to the asserted crime. The jury determined that she had dictated that statement to the police. She also signed the sworn larceny statement affidavit in support of the larceny charge. Since Nelson did not contend that Messina lied to intentionally misled Det. Rivera in any way, her credibility was not challenged. On these circumstances, there was probable cause for Nelson's arrest. . . .
> Further, because Nelson did not claim that the detectives learned of intervening facts, after his arrest and prior to the execution of the felony complaint which could have caused probable cause to dissipate, there was probable cause for the commencement of the prosecution as well.

(Defs.' Rev. Mem. in Supp. at 12 (citations omitted).)

The jury in this case was charged, in pertinent part, as follows with respect to probable cause:

> The test is not whether plaintiff was ultimately convicted of a charged crime, or some lesser or other offense, but whether a reasonable police officer under the same circumstances would have believed that an offense had been committed and that plaintiff was the person who committed it. An arrest may not be based upon speculation or conjecture. An officer has probable cause if he has been advised of a statement signed by a person who claims to be a victim which statement contains sufficient information for a reasonable officer to believe that a crime was committed and the plaintiff was the person who committed the crime and there are no circumstances that raise doubts as to the victim's veracity.

(Court's Jury Charge (DE 78) at 24.) *See Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("It is well-established that a law enforcement official has probable cause

to arrest if he received his information from some person, normally the putative victim or eyewitness unless the circumstances raise doubt as to the person's veracity.") (internal quotation marks and citations omitted).

Viewing the evidence in the light most favorable to the Plaintiff, a reasonable jury could conclude that there were circumstances that raised doubts as to whether a crime was committed by Nelson. First, there is the surveillance video from the Ultra Diamonds store. While Defendants maintain that it provides probable cause that a crime was committed by Nelson, a reasonable jury could conclude otherwise. The video does not show plaintiff stealing or even touching the bracelet that was claimed to be missing. Indeed, the bracelet cannot be seen anywhere in the surveillance video and it does not corroborate Messina's version of the events. The video does not show that Messina placed any object on the counter, never mind a placing a piece of jewelry to her left (or that there remained on the counter any object she had previously placed there) just before she turned her back. It appears that each item she took off of the movable cart and placed on the counter was then placed back into the display case before she turned away. Given that it does not show an item on the top of the display case before she turned her back, a jury could conclude that the circumstance raised doubt about whether Nelson committed a crime. Also, they could reasonably conclude that Nelson did not take anything. The video shows Nelson approaching the display as Messina turns away but it is his left hand (i.e., the hand farthest away from any supposed item) and not his right hand that seems, at best to barely graze the counter. Given the foregoing, it warrants

mention that there is no evidence that either of responding officers at the scene, viz. Detective Rivera and Officer Lankewicz, asked Messina to look her work station to see if she had placed the bracelet elsewhere. An additional circumstance that casts doubt on whether Nelson committed a crime is the fact that Nelson was a **known** customer of the Ultra Diamonds store.[3] He had been in there purchasing merchandise on a number of occasions and was there on the day in question to bring back a piece of jewelry that needed repair. His name and all his contact information was readily available to the store. Also, there is the fact that Nelson he went down to the police station on his own initiative, an action which Hudson characterized as "odd" given that people he (Hudson) is investigating do not usually show up to speak to him. (Tr. at 52-53.) And while "an officer's failure to investigate an arrestee's protestations of innocence *generally* does not vitiate probable cause," *Panetta*, 460 F.3d 395-96 (emphasis added), the jury could reasonably conclude that such an oddity should have resulted in Defendants investigating those protestations.

Defendants argument that that Messina's credibility was not challenged is unconvincing in view of the evidence presented. According to Messina, prior to Nelson leaving the store she was not "concerned about the possibility that he had taken the bracelet." (Tr. 260.) Rather she came to believe that he had stolen the bracelet "[a]fter watching [the video] three to six times or so *with* three, one police

---

[3] Indeed, that Messina could and did identify Nelson by name in her November 17, 2011 statement causes one to wonder why it was then necessary for her to further recite that he "is a black male." (*See* Pl.'s Ex. 2.)

officer and two detectives, saying they believe he took something in the case." "They believed he took an item from the counter." "Rivera said it appeared from the video Mr. Nelson did take something from the case. We would be unsure of what it was." (Tr. 262, 266 (emphasis added).) Given the police's role in affecting her beliefs, it would be incongruous to hold that as a matter of law that her statement provides probable cause for Nelson's arrest.

Given the totality of the circumstances, *see Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013), a reasonable jury could conclude that there was a lack of probable cause to arrest Nelson or to commence and continue the criminal proceeding against him.

With respect to the malicious prosecution claim, it is also significant that when Hudson and Rivera were informed the following morning that the bracelet had been found, there was no probable cause to commence or continue the prosecution, yet the jury apparently concluded that neither defendant took appropriate steps to ensure that it was discontinued given their interrogatory answers, to wit that  (1) (notwithstanding the officers' testimony to the contrary) they did not place a call to the Suffolk County District Attorney's Office on the morning of November 18, 2011 and advise them that the bracelet had been found and (2) that the District Attorney's Office did not know before Plaintiff was arraigned that the bracelet had been found. *See generally Jocks* v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2013) (stating that to succeed on a claim for malicious prosecution, a plaintiff must prove, among things, "the initiation or *continuation* of

a criminal proceeding against plaintiff") (emphasis added). Indeed, the jury apparently rejected the veracity of both the Defendants' testimony that they tried to reach the DA's office as soon as they got the call the bracelet had been found, as well as the officers' notes reflecting that they waited until they returned to the precinct before trying to get in touch with the DA's office rather than calling earlier. Moreover, rather than take a statement from Messina at the store, Defendants' testified that they acceded to her request to come down after work to give a follow-up statement. In other words, they did not take appropriate action to timely notify the DA that the bracelet had been found. The jury could reasonably reject Defendants' testimony (*see, e.g.*, Tr. at 236) that there was nothing they could do to stop the prosecution once they placed Nelson under arrest. The jury could have concluded that Defendants had sufficient time prior to Nelson's arraignment to get an affidavit from Messina and send it to the DA's office or otherwise advise the prosecutor that, in fact, no crime had been committed. Alternatively, given the testimony of former ADA Ross (the ADA at Nelson's arraignment) that he did not have the power to prosecute or decline to prosecute until the arraignment, as it is at that point a court acquires jurisdiction (Tr. 401), the jury could have concluded that probable cause evaporated once Messina advised the Defendants that the bracelet had been found and that control of the prosecution had not yet passed from the police to the District Attorney. *See Weiner v. McKeeffery*, 90 F. Supp. 3d 17, 36-37 (E.D.N.Y. 2015).[4]

---

[4] In *Weiner*, the Court granted summary judgment in favor of defendant police officer on plaintiff's false arrest claim but found there was a genuine issue whether probable cause continued to exist

Accordingly, to the extent Defendants' Rule 50 motion is premised on the argument that there was probable cause as a matter of law thus vitiating the claims for false arrest and malicious prosecution, the motion is denied.

## C. Arguable Probable Cause and Qualified Immunity

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's actions did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks and citations omitted).

An officer is entitled to qualified immunity against a claim for false arrest if he can establish that he had "arguable probable cause" to arrest the plaintiff. *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met. In deciding whether an officer's conduct was objectively reasonable, we look to the information possessed by the officer at the time of the arrest, but we do not consider the subjective intent, motives, or beliefs of the officer. The relevant, dispositive inquiry in determining whether a

---

after the arrest given that the police officer had in his possession information regarding plaintiff's innocence and there was a question as to what happened between arrest and arraignment including whether control of the prosecution had passed into the hands of the prosecuting attorney. As Judge Bianco noted in *Weiner* "there may be a break in the causation chain between police and prosecutors sufficient to free police officers from liability on any claim for malicious initiation/continuation of a prosecution and that plaintiff's claim for malicious prosecution against the officer would fail "if control of his prosecution passed from the Suffolk County police to the District Attorney *after* his arraignment and the arresting officers were no longer involved in the case." 90 F. Supp. 3d at 36 (emphasis added).

right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Garcia*, 779 F.3d at 92 (internal quotation marks and citation omitted).

Defendants maintain that there was, at the very least, arguable probable cause for Nelson's arrest and prosecution. They argue:

> The jury indicated in its answers to interrogatories that Messina dictated her statement to Det. Rivera. At the very least, there was "arguable probable cause" to arrest and charge Nelson based on Messina's sworn statement, which the jury determined she dictated to the police. *Singer*, 63 F.3d 110. Furthermore, the jury also determined that Det. Rivera had watched the security video which confirmed Messina's statement in that it depicted Messina placing something on the display counter and turning momentarily, then turning back and noticing the item was gone and Nelson walking away from the counter. Plainly there was arguable probable cause for Nelson's arrest and brief prosecution such as affords the detectives qualified immunity from his false arrest and malicious prosecution claims.

(Defs.' Rev. Mem. in Supp. at 15.)

Preliminarily, the Court notes that contrary to the suggestion in the excerpt above, the jury made no finding that the security video confirmed Messina's statement.[5] In fact, there was no request by Defendants that such a question be put to the jury. Nor was there a request to ask the jury to determine whether Rivera influenced what Messina put in her statement. (*See* Defendants' Proposed Verdict Form (DE 74).) Absent that information, among others, the Court must construe the evidence in favor of Plaintiff and such a construction does not permit the conclusion

---

[5] Parenthetically, as noted earlier in the text, a perusal of the video fails to show "Messina placing something on the display counter" and it disappearing when she turned her back, nor does the synopsis of Defendants' position on arguable probable acknowledge Messina's testimony that her statement identifying Nelson as the wrongdoer was only given after the officers volunteered that their perusal of the video so indicated.

that there was arguable probable cause. *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) ("To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question. If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding."); *Ellis v. LaVecchia,* 567 F. Supp. 2d 601, 609 (S.D.N.Y. 2008) (holding that because defendant "failed to request special interrogatories going to the factual issues relating to [p]laintiffs' malicious prosecution claim, the record is insufficient to permit the Court to make a finding in Defendant's favor on the qualified immunity issue as a matter of law under Rule 50.")

As set forth earlier, a reasonable jury could conclude (and the instant jury apparently did conclude) that the surveillance video does not support that there was a piece of jewelry on the counter or that if there was a piece of jewelry on the counter not visible because Messina was blocking it that Nelson's hand came near enough to that portion of the display counter to take it. That conclusion either alone or together with the other circumstances, such as Nelson "oddly" coming down to the police station on his own, supports that no reasonable police officer could believe, albeit mistakenly, that there was probable cause to arrest Nelson for theft of the bracelet. For all the reasons set forth above, Defendants are not entitled to qualified immunity on either the false arrest or the malicious prosecution claim.

With respect to the malicious prosecution, there are additional factors that support that conclusion. Hudson and Rivera were informed on the morning of November 18, the day after Nelson's arrest, that the bracelet had been found, and a reasonable officer could not believe that there was probable cause to continue to hold Nelson or to continue to prosecute him. *Cf. Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) ("In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact."); *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir.2 014) ( "[P]robable cause is a defense to a claim of malicious prosecution if it is not later nullified by information establishing the defendant's innocence."). Based on the jury's answers to the special interrogatories, it is clear the triers of fact concluded that Defendants did not take appropriate steps to ensure that Nelson was released, and the prosecution discontinued. The jury found that the officers did not call the Suffolk County District Attorney's Office on the morning of November 18, 2011 and advise that office that the bracelet had been found and further that the District Attorney's Office did not know before Plaintiff was arraigned that the bracelet had been found. No reasonable officer could believe that the failure to timely pass on such critical information was lawful. *See Manganiello v. City of New* York, 612 F.3d 149, 165 (2d Cir. 2010) (holding that district court correctly concluded that no reasonable officer could believe that it is lawful, among other things, to fail to pass on material information to the prosecutor's office). Additionally, according to the Defendants' testimony, rather than take a statement from Messina at the store, interrupting her

work for only a short period of time, they acceded to her request to come down after work to give a follow-up statement. In other words, they put the Ultra Diamonds store's ability to conduct business without even a short interruption over securing the freedom of a wrongly charged individual.

Finally, Defendants did not request any questions be put to the jury regarding whether, having been advised of that the bracelet was found, they could have secured Nelson's release and/or prevented the continuation of the proceedings against him. As noted earlier, the jury could reasonably reject Defendants' testimony (*see, e.g.*, Tr. at 236), on credibility grounds, that there was nothing they could do to stop the prosecution once they placed Nelson under arrest. The jury could have concluded that Defendants had sufficient time prior to Nelson's arraignment to advise the prosecution of the misplaced jewelry being found. *See generally Hutchinson v. Solomon*, 2018 WL 4757970, *12 (S.D.N.Y. Sept. 29, 2018) (arresting officer may be held liable for malicious prosecution when he withholds relevant information). Alternatively, given the testimony of former ADA Ross (the ADA at Nelson's arraignment) that he did not have the power to prosecute or decline to prosecute until the arraignment as it is at that point a court has jurisdiction (Tr. 401), the jury could have concluded that control of the prosecution had not passed from the police to the District Attorney. *See Weiner,* 90 F. Supp. 3d at 36-37. Finally, the jury could have found, and apparently did so find based on their verdict in Plaintiff's favor on the denial of a fair trial/due process claim, that Hudson and Rivera misled the DA's office by indicating that the video caught

Nelson in the commission of a crime. *See Mitchell v. Victoria Home*, 434 F. Supp. 2d 219 (S.D.N.Y. 2004).

Accordingly, the Rule 50 motion premised on the assertion that Defendants' are entitled to qualified immunity on the claims for false arrest and malicious prosecution claim is denied.

### D.    The Due Process/ Fair Trial Claim

Defendants assert that Nelson's denial of due process/fair trial claim should have been dismissed instead of being sent to the jury for two reasons. First, "[t]his claim, as structured by Nelson, is indistinguishable from a § 1983 malicious prosecution claim and was therefore duplicative." Specifically, "[p]ermitting a § 1983 claim of denial of fair trial to be based on the execution of a charging instrument would make a denial of a trial essentially identical to one of malicious prosecution." Second, Det. Rivera did not sign the felony complaint. (Defs.' Rev. Mem. in Supp. at 16-17.) Neither argument is convincing.

"[F]air trial claims based on fabrication of information [are restricted] to those cases in which an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result. In order to succeed on a claim for a denial of the right to a fair trial against a police officer based on an allegation that the officer falsified information, an arrestee must prove by a preponderance of the evidence that the officer created false information, the officer forwarded the false information to prosecutors, and the false information was

likely to influence a jury's decision. These requirements all provide necessary limits on the reach of a denial of a fair trial claim based on false information." *Garnett v. Undercover Officer C0039*, 838 F.3d 265. 279-80 (2d Cir. 2016) (internal citations omitted).

The distinction that Defendants seek to draw is contrary to the very cases they cite. For example, in *Bertuglia v. City of New York,* 839 F. Supp. 2d 703, 723 (S.D.N.Y. 2012) claims for both malicious prosecution and denial of fair trial were asserted based on allegations that the defendants encouraged the prosecution of the plaintiff while providing false information that served as the basis for the prosecution. In allowing both claims to proceed, the court wrote:

> "Pursuant to § 1983 and prevailing case law, denial of a right to a fair trial is a separate and distinct cause of action." *Nibbs v. City of New York*, 800 F. Supp. 2d 574, 575 (S.D.N.Y. 2011); *see generally Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123 (2d Cir.1997). A plaintiff may state a § 1983 fair trial claim by pleading that the defendants fabricated evidence and forwarded it to the prosecutors, and that the fabricated evidence was "likely to influence a jury's decision." *Id.* at 130. "[C]ourts in this District have regularly found *Ricciuti* to stand for the proposition that a claim for denial of a right to a fair trial may be brought alongside one for malicious prosecution even where both are supported by the same evidence." *Nibbs*, 800 F. Supp. 2d at 576 (collecting cases).

*Id.* at 723-24.[6]

That both claims may proceed even when based on the same evidence is supported by the decision in *Morse v. Spitzer*, 2012 WL 3202963 (E.D.N.Y. Aug. 2,

---

[6] Moreover, a § 1983 fair trial claim does not require that a plaintiff actually go to trial. *See Ricciuti*, 124 F.3d at 127; *see also Douglas v. City of New York*, 595 F. Supp.2 d 333, 346 (S.D.N.Y. 2009) ("The Second Circuit has permitted a claim under § 1983 for violation of the right to a fair trial to proceed even where no trial took place.").

2012), another case cite by Defendants. As that court noted, a claim for malicious prosecution is grounded in the protections of the Fourth Amendment and an essential element of such a claim is the absence of probable cause. *Id*. at *2. In contrast a claim asserting the denial of a right to a fair trial "finds it roots in the Sixth Amendment, as well as the due process clauses of the Fifth and Fourteenth Amendments, which secure the fundamental right to a fair trial in criminal proceedings." *Id*. at *3. The existence of probable cause is irrelevant to such a claim. *Id*. at *5. Finally, although in the majority of cases "the question of whether the defendant fabricated evidence becomes synonymous with the question of whether genuine probable cause existed, and accordingly a plaintiff's malicious prosecution and fair trial claims would rise or fall together" nonetheless "these remain distinct constitutional claims." *Id*. at *6.[7]

Defendant's argument that a fair trial claim cannot be based on an officer's "arrest paperwork, as opposed to evidentiary items created by a police, such as false confessions, forged documents or planted drugs" is belied by the very case it cites, to wit *Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016). Therein, the Circuit held that "*any* information fabricated by an officer can serve as the basis of a claim for a denial of the right to a fair trial . . . ." *Id*. at 279 (emphasis in original).

---

[7] Defendants cite *El v. City of New York*, 2015 WL 1873099, at *2 (S.D.N.Y. Apr. 23, 2015) for the proposition that "permitting a § 1983 claim of denial of a fair trial to be based on the execution of a charging instrument would make a claim of denial of a trial essentially identical to one of malicious prosecution." (Defs.' Mem. in Supp. at 16) However, that case does not support any such proposition; in fact, that case neither presented a claim for, nor discussed the issue of, a claim for denial of a fair trial.

Lastly, that Defendant Rivera did not sign the felony complaint or other arrest paperwork does not insulate him from liability as the jury also found against him on the failure to intervene claims.

The Rule 50 motion is denied as to the claim for the denial of due process/ fair trial.

## E.    Failure to Intervene

In support of their Rule 50 motion addressed to the claim for failure to intervene, Defendants argue that "this claim is deficient as a matter of law and the jury should not have been permitted to consider it" because "[w]here as here an individual defendant is alleged to have personally committed the subject constitutional violations, he cannot also be held liable for failing to intervene to prevent those violations." (Defs.' Rev. Mem. in Supp. at 17.)

As Plaintiff correctly points out, no such argument was made in Defendants' motion at the close of Plaintiff's case. (Pl.'s Rev. Mem. at 12; *see* Tr. at 430-39.) Defendants do not address this failure in their Reply. (*See* Defs.' Rev. Reply at 7.)

It is well settled that Rule 50(b) relief is available only if a party "sought such relief before the jury retired to deliberate under Fed. R. Civ. P. 50(a)(2) and limits the permissible scope of the later motion to those grounds specifically raised in the prior motion for [judgment as a matter of law]." *Provost v. City of Newburgh*, 262 F.3d 146, 161 (2d Cir. 2001) (internal quotation marks omitted); *see also Conte v. County of Nassau*, 2017 WL 837691, at *6 (E.D.N.Y. Mar. 3, 2017) ("Once a case has been submitted to the jury, a motion for [judgment as a matter of law] 'may be

renewed only on grounds that were specifically articulated before submission of the case to the jury.' ") (quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998) ). And while such a deficiency can be excused to prevent manifest injustice, *see, e.g., Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994) ("Thus, if an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is required to prevent manifest injustice.") (internal quotation marks omitted), no such argument has been presented here.

In any event, as the Court explained when this issue came up at the charge conference:

> One of the things I advise the jury or instruct the jury about is the necessity to consider each defendant separately. The jury may conclude they were a team acting appropriately or inappropriately. On the other hand, the jury may decide one of the detectives acted appropriately, the other didn't, but the one that didn't is, nonetheless -- bears some responsibility because he should have interceded and stopped the alleged constitutional violation by his partner.

(Tr. 582.)

The failure to intervene portion of Defendants' Rule 50 motion is denied.

## F.    Weight of the Evidence

According to Defendants "[v]iewing the evidence rationally and as a whole, it becomes plain that the jury's verdict against the detectives is against the weight of the evidence and should be set aside. The evidence was overwhelming that there was ample probable cause for Nelson's arrest and brief prosecution." (Defs.' Rev. Mem. at 18.) The Court does not agree.

For the reasons set forth in section IB supra, there was ample evidence to support the jury's determination that no probable cause existed for the arrest or for the prosecution. Briefly, the video does not show that Messina left anything on the counter or that Nelson's hand was positioned so as to take anything that might have been left on the counter. While the jury determined that Rivera watched the video on November 17, 2011, they made no determination as to what the video showed.

Defendants' also argue that there was "unrefuted" evidence "that Det. Rivera attempted to call the District Attorney's office immediately upon learning that the bracelet had been found but was unable to reach ADA Ross; that his supervisor was able to reach ADA Ross before Nelson was arraigned but the prosecutor's office decided to proceed with Nelson's arraignment nonetheless." (Defs.' Rev. Mem. at 18-19.) This argument assumes that the jury was required to accept this evidence and ignores that the jury was entitled to judge the veracity of the testimony presented based on their assessment of the credibility of the witnesses.

The verdict was not against the weight of the evidence.

## II. The Rule 59 Motion

Defendant's assert that the following conduct of Plaintiff's counsel warrants a new trial:

> During his summation, Nelson's trial attorney, Cary London, Esq., exhorted the jury to reject evidence which Nelson had made no effort to controvert on the basis that the detectives and other defense witnesses were not truthful. He called a defense witness "a little lying robot." He stated that they were perpetrating a "cover-up." In particular, he told the jury that Det. Rivera's testimony that he had called ADA Ross,

which Nelson had made no effort to refute, was untrue, and they should reject it. Mr. London further told the jury during summation that the detectives "knew they would be sued." He said that the detectives and defense counsel had treated Nelson and his wife (who was not a party) "like criminals." He told the jury "liability is so strong", that there is "100% liability" and that there is "absolute liability." Over defense counsels' objections objection, he was permitted to address individual jurors by name during summation. Counsel's remarks during summation were in addition to the several improper and prejudicial remarks made during trial to the jury, including that a witness should not listen to defense counsel and that the detectives were guilty of criminal perjury under the N.Y. Penal Law.

(Defs.' Rev. Mem. at 19-20).

The law in this area was aptly stated in *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.,* 955 F. Supp. 2d 118 (E.D.N.Y. 2013). As that court stated:

To begin with, when arguing to a jury, counsel must properly have some latitude, so long as prejudice does not appear. For this reason, [n]ot every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted The determination of whether remarks made during summation give rise to a new trial remains in the trial court's broad discretion. Moreover, the court making such a determination should consider counsel's summation in its entirety within the context of the court's rulings on objections, the jury [charge], and any corrective measures applied by the trial court. The relevant inquiry in assessing undue prejudice is whether there is a reasonable probability that the jury's verdict was influenced by the improper conduct of counsel.

Moreover, [w]hen the complaining party fails to object at trial to statements made during summation, the court will only grant a new trial when the error is so serious and flagrant that it goes to the very integrity of the trial. . . . Although the Court understands that defense counsel might have declined from objecting further for strategic purposes, the absence of a contemporaneous objection requires the Court to find flagrant abuse before granting a new trial.

*Id.* at 155-56 (internal quotation marks and citations omitted) (alterations in original).

Addressing first the refenced statements during counsel's closings, except for one instance to be discussed separately, there was no objection by the defense during the closing itself. After plaintiff's closing, the defense requested that the jury be given two curative instructions: (1) that the arguments of counsel are not evidence and it is the jurors recall of the evidence that is controlling and (2) that the court will charge the jury as to the applicable law and the attorneys say is not the law. The requested instructions were given to the jury. (Tr. 664-669.)[8]

Here, counsel's closing was neither unduly prejudicial nor did it play upon the jury's sympathy. To the extent the closing may have been passionate, it was not prejudicial given the nature of the claims, including that Defendants arguably fabricated evidence. In any event, the Court's curative instruction was sufficient to dispel any prejudice. Finally, notwithstanding the defense's objection, there was nothing improper in counsel addressing individual jurors by name during summation.

Last to be addressed are the only two specified alleged "improper and prejudicial remarks made during trial," to wit that "a witness should not listen to defense counsel and that the detectives were guilty of criminal perjury under the N.Y. Penal Law." With respect to the first instance, the referenced transcript portion does not support that counsel told a witness not to listen to defense counsel.

---

[8] Defense counsel also stated that she believed defendants were entitled to a mistrial but was not making such a motion in accordance with her clients' wishes. (Tr. 665-66.)

With respect to the second instance, the objection was sustained, and the jury instructed to disregard the questions and answers.

The asserted bases do not support the granting of a new trial.

## III.    The Request for Remittitur

Defendants also seek a new trial on damages, or in the alternative remittitur. They challenge the punitive damage award in this case arguing that their request is justified by the disparity between the actual or potential harm suffered by plaintiff and the punitive damages award. Although they do not state what the amount of the remittitur should be, based on the cases they cite, they appear to seek a ratio of no more than 2:1. (*See* Defs.' Rev. Mem. at 20-24.)

Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir.1990). In fulfilling their obligation to ensure that punitive damages award are "fair, reasonable, predictable, and proportionate," courts are to use the following guideposts set by the Supreme Court in *BMW of N. America v. Gore*, 517 U.S. 559 (1996): "(1) degree of reprehensibility of the defendant's conduct, (2) relationship of the punitive damages to the compensatory damages, and (3) criminal and civil penalties imposed by the state's law for the misconduct in question." *Payne v. Jones*, 711 F.3d 85, 101 (2d Cir. 2013) (citing *Gore*, 517 U.S. at 574-75); *accord Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014).

While Defendants focus exclusively upon the second *Gore* factor, consideration of the other factors is appropriate. Indeed, the first *Gore* factor, the reprehensibility of the defendants' conduct, is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575.

Three "aggravating factors" have been identified as "associated with particularly reprehensible conduct." They include: "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Lee v. Edwards*, 101 F.3d 805, 806 (2d Cir. 1996) (citing *Gore*, 517 U.S. at 576).

Here, the conduct was not violent and there was no evidence presented that Defendants engaged in repeated instances of the relevant wrongdoing. Hence, only the second aggravating factor is relevant. The jury found that Defendants had no probable cause to arrest Nelson or to prosecute him, the latter requiring them to find that Defendants acted with malice. Additionally, in finding for Plaintiff on his fair trial claim, the jury apparently agreed with his position that the paperwork submitted to the DA's office to support the charge was false. Based on their answer to the interrogatories submitted to them, the jury found that Defendants did not make any effort to secure Nelson's release on November 18 after they were advised the missing bracelet had been found, i.e. once they had confirmation that he was innocent. These factors support concluding that Defendants' conduct was reprehensible. *Cf. Morse v. Fusto*, 2013 WL 4647603, *31 (E.D.N.Y. 2013) (finding

that while defendants' conduct, as found by the jury, in creating false or fraudulently securing altered documents was reprehensible, given that defendants had in their possession evidence to suspect the plaintiff of fraudulent billing "their actions were less blameworthy than one who goes after someone *knowing* that that individual is innocent." ) (emphasis in original).

The second *Gore* factor is the ratio of punitive to compensatory damages. Here that ratio is a little over 7:1. In this regard, the following excerpt from in *Payne* is instructive:

> When the compensable injury was small but the reprehensibility of the defendant's conduct was great, the ratio of a reasonable punitive award to the small compensatory award will necessarily be very high. *See, e.g., State Farm*, 538 U.S. at 425, 123 S. Ct. 1513 ("[R]atios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." (internal quotation marks omitted)); *Lee*, 101 F.3d at 811 ("[I]n a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated.... [T]he use of a multiplier to assess punitive damages is not the best tool...."). If in such cases significant punitive awards are not available, because of the high ratio in relation to the compensatory award, a plaintiff will often be unable to sue as attorneys would be unable to collect a reasonable fee through a contingency arrangement. Thus, in cases of very small injury but very reprehensible conduct, the appropriate ratios can be very high. In *Lee*, for instance, the plaintiff was awarded $1 in nominal damages and $200,000 in punitive damages on his malicious prosecution claim under 42 U.S.C. § 1983 against a police officer who attacked him and then falsely accused him of assault. *See Lee*, 101 F.3d at 807–08. On appeal, we reduced the punitive damages to $75,000. *See id*. at 813. Even after the remittitur, the ratio was huge at 75,000 to 1. But 75,000 to 1 was an appropriate ratio on those facts. In such cases, the large size of the ratio has no necessary bearing on the appropriateness of the amount of punitive damages. On the other hand, when the harm to the plaintiff is substantial, and sufficient to result in a compensatory award large enough to finance a reasonable contingent attorneys' fee, even a single digit ratio can mean a high punitive award approaching $1 million. Thus, the Supreme Court

observed in *State Farm*, "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit. . . ." 538 U.S. at 425, 123 S.Ct. 1513.

Here, the ratio of the $300,000 punitive damages award to Jones's $60,000 compensatory award is 5 to 1. The ratio, without regard to the amounts, tells us little of value in this case to help answer the question whether the punitive award was excessive. Had the facts of the harm to Payne been such that the jury appraised his compensable loss at only $10,000 based on the same conduct by Jones, and the jury had imposed a punitive award on Jones of $100,000, we would not consider the punitive award excessive, even though the ratio of 10–to–1 would have been twice as high as the 5–to–1 ratio that actually resulted. On the other hand, if exactly the same conduct by Jones had caused Payne $300,000 of compensable harm by reason of a concealed susceptibility of which Jones was not aware, and the jury had imposed the same $300,000 in punitive damages, the punitive damages would appear to us to be very high (because of the relevant low degree of reprehensibility of Jones's conduct) although representing only a 1–to–1 ratio. The 5–to–1 ratio of punitive to compensatory damages, by itself, tells nothing about whether the punitive award was excessive, but given the substantial amount of the compensatory award, the punitive award five times greater appears high.

711 F.3d at 102–03; *accord State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 425 (2003) (stating that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," but later stating in the same opinion that greater ratios "may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages."); *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996) (noting that a punitive damages award over 500 times greater than a compensatory damages award could be reasonable where the compensatory damages are nominal); *but cf. Turley,* 774 F.3d at 165 ("As a general matter, the four-to-one ratio of punitive to compensatory damages awarded is close

to the line of constitutional impropriety. And where, as here, the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases, lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.") (internal quotation marks and citations omitted).

The jury in this case was not asked to specify the nature of the compensatory damages they were awarding. There was evidence, however, that Nelson spent approximately $3,000.00 for a criminal defense attorney. (*See* Tr. 423.) Thus, viewed in the light most favorable to Plaintiff, the record permits presuming that $3,000 of the compensatory award was for economic damages, with the remaining $4,000 awarded for non-economic damages caused by Defendants' conduct. But even though the award includes non-economic damages, the compensatory award cannot be characterized as, by any means, overly generous.

The cases cited by Defendants (Defs.' Rev. Mem. at 23-24) are of little assistance. First, only two of the six cases cited (*see* Defs.' Rev. Mem. at 23-24) involve claims of false arrest and malicious prosecution. *See Stampf v. Long Island Railroad*, 761 F.3d 192 (2d Cir. 2014); *Tretola v. County of Nassau*, 14 F. Supp. 3d (E.D.N.Y. 2014); the remaining cases involve claims of employment discrimination, excessive force and First Amendment retaliation. Second, in each of the six cases cited the compensatory awards were far larger than the award in the present case. The jury in *Payne* awarded $60,000 in compensatory damages and $300,000 in punitive damages; the Second Circuit reduced punitive damages to $100,000. *See*

711 F.3d at 101-06. In *Stampf,* the jury awarded compensatory damages $200,000 for past emotional damages, $100,000 for future emotional damages and $30,000 for out of pocket damages, together with $150,000 in punitive damages. The Second Circuit reduced the awards for past and future emotional damages to $100,000 and the $20,000, respectively and reduced the punitive damage award to $100,000. 761 F.3d at 204-11. A jury awarded the employment discrimination plaintiff in *Turley v. ISG Lackawanna, Inc.* $1.32 million compensatory damages and $24 million in punitive damages, with the latter award reduced to $5 million by the district court. On appeal the Circuit remanded for reconsideration of the punitive damages award stating it had to be reduced to no more than twice the compensatory award. 774 F.3d 140, 165-68 (2d Cir. 2014). In *Tretola,* a $3 million compensatory award that included $2.4 million for non-economic injury was reduced to $760,605 and a punitive damages award of $2 million was reduced to $175,000. 14 F. Supp. 3d at 80-90. The court in *Fisher v. Mermaid Manor Home for Adults, LLC*, 2016 WL 7330554 (E.D.N.Y.  Dec. 16, 2016) reduced a $250,00 punitive damages award to $50,000 where the employment discrimination plaintiff had been awarded $25,000 in actual damages. *Id.* at *8. The jury in *Wallace v. Suffolk County Police Dept.* awarded the plaintiff $200,00 compensatory damages for emotional distress as well as punitive damages of $225,000 against each of the three defendants for a total award of $875,000. 2010 WL 3835882, at * 1 (E.D.N.Y. Sept. 24, 2010). The district court found the punitive damages award excessive and granted a new trial on

damages unless the plaintiff accepted a remittitur of the punitive damages awards to $100,000 per individual defendant. *Id.*

The third factor to be considered are the civil and criminal penalties imposed by the state's law for the misconduct in question. *See Payne*, 711 F.3d at 101. Neither party in this case addresses this issue; thus, no applicable civil penalties have been brought to the Court's attention. While it does not appear the conduct of these Defendants was criminal, in *Stampf*, a case also involving claims of false arrest and malicious prosecution, the Second Circuit looked to the offense of "falsely reporting an incident in the third degree" under New York law, a class A misdemeanor. N.Y. Penal Law § 240.50. In New York, a person convicted of a class A misdemeanor may be sentenced to a term of imprisonment "not [to] exceed one year," N.Y. Penal Law § 70.15(1), and he or she may be fined by an amount "not exceeding one thousand dollars," N.Y. Penal Law § 80.05, but neither a prison sentence nor a fine is required under New York law. According to the Circuit, that New York classifies such conduct "as warranting criminal prosecution tends to confirm the appropriateness of the imposition of a punitive award" but "the fact that the offense is only a misdemeanor and that courts are at liberty to impose no imprisonment or fine whatsoever tend to suggest that New York regards this conduct as occupying the lower echelons of criminality." 761 F.3d at 211 (internal quotation marks omitted). Here, the conduct, construed most favorably to plaintiff, while reprehensible particularly with respect to the officers' conduct after it became

known that no crime was committed, is far less egregious than the conduct implicated in *Stampf*.

Having considered the *Gore* factors, the Court finds that a ratio of 3 to 1 is appropriate in this case. Although the conduct of Defendants was reprehensible, there is no evidence that it was repetitive. Moreover, less than half the compensatory award was for economic damages. Finally, New York regards falsely reporting an incident, assuming the conduct at issue can be classified as criminal, as being on the lower end of criminality. Accordingly, remittitur is appropriate, and defendants are granted a new trial on punitive damages[9] unless Plaintiff accepts a reduced punitive damages award totaling $21,000.00.

## IV.    The Issue of Apportionment or Set-Off

Relying upon the decision in *Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017), Defendants maintain they are entitled to an adjustment of the compensatory damages award, either by setoff or apportionment, due to Plaintiff's settlement of his claims against Ultra Stores, Inc,, Messina and Karen Bahler[10] (the "Settling Defendants").

By way of background, Plaintiff originally commenced this action on November 16, 2012, asserting claims for violation of his Fourth, Fifth and Fourteenth Amendment rights, and for false arrest, failure to intervene, negligence, negligent infliction of emotional distress against both the Defendants and the

---

[9] *See Payne*, 711 F.3d at 106 (vacating punitive damages award and ordering a new trial limited to the issue of the amount of punitive damages unless plaintiff agreed to remittitur).

[10] The Court notes parenthetically that Karen Bahler was not mentioned during the trial and her role in the relevant events is unknown.

Settling Defendants, as well as claims for negligent, hiring, retention, training and supervision against the County of Suffolk and Ultra Stores and a *Monell* claim against the County of Suffolk . On January 24, 2013, Plaintiff filed a stipulation of dismissal with prejudice as against the Settling Defendants.

Two weeks prior to trial, the parties filed their pre-trial memoranda, proposed requests to charge and proposed verdict sheets as required by the Court's Individual Practice Rules. Neither Defendants' pre-trial memorandum (DE 59)[11], their requests to charge (DE 57) nor their proposed verdict sheet (DE 58) made any mention of apportionment or set-off. It was not until July 9, 2018, the first day of trial, that Defendants filed a revised proposed verdict sheet which asked the jury to determine the total amount of damages suffered by Plaintiff as a result of the "wrongful acts" of both the Defendants and the Settling Defendants and to indicate the percentage of Plaintiff's total damages caused by each. (DE 66.) The proposed revised verdict sheet was not accompanied by any additional proposed jury instructions, although the defense did bring the *Restivo* decision and the revised verdict sheet to the Court's attention that morning, albeit without specifying *Restivo's* significance (*see* Tr. at 2-3).

The issue of apportionment came up during the cross-examination of Plaintiff on the second trial day when the defense asked how much he was paid by the Settling Defendants. (Tr. 375-379.) After reviewing the decision in *Restivo*, the

---

[11] The Court's Individual Practice Rules require that pre-trial memoranda "address all contested issues and/or anticipated legal issues and anticipated evidentiary issues" as well as "the elements of each claim or defense asserted." Rule 6(B).

Court suggested that the issue could be deferred and the defense agreed. (Tr. 380-384.) The defense raised the question of apportionment again the following day asking whether the Court had a proposed verdict sheet indicating how the issue was to be handled, but still no proposed jury instruction regarding apportionment was provided.

Having provided some background, the Court will now turn to whether under *Restivo* Defendants are entitled to a set-off or apportionment of compensatory damages.

In *Restivo* the Second Circuit addressed the availability of an off-set in a § 1983 action. First, the court evaluated whether state or federal law would apply in determining whether a setoff was available. The court applied the following three-part test. "First, if federal law is neither deficient nor inapplicable, it will apply. Second if federal law does not apply, state law does apply, unless, third, state law would be inconsistent with the Constitution and laws of the United States." 846 F.3d 582.

The *Restivo* court found "federal law is deficient because federal statutory law is silent on the question of the effect of a settlement on the damage award against a non-settling defendant in a Section 1983 case, and because federal common law is not clear on this point." *Id.* That reasoning applies here. Moreover, Defendants never requested a charge addressed to the fault of the settling parties. Further, while claims for negligence and negligent infliction of emotional distress were asserted by Plaintiff against both the Defendants and the Settling Defendants, no

such claims are cognizable against the Defendants. *See, e.g., Sullivan v. Lakeram,* 2016 WL 4097856 (S.D.N.Y. July 28, 2016) ("Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution.') (quoting *Bernard v. United* States, 25 F.3d 98, 102 (2d Cir. 1994); *Smith v. City of New York*, 2015 WL 4008642, *3 (E.D.N.Y. June 26, 2015). Rather, a plaintiff seeking relief from injuries flowing from an arrest, investigation, or prosecution is instead limited to the traditional intentional tort remedies of false arrest and malicious prosecution. *Sullivan*, 2016 WL 4097856, at 84. No such limitations exist with respect to the Settling Defendants.

Next, the *Restivo* court found that New York law "which provides for either a pro-tanto (dollar for dollar) setoff or setoff of the settling tortfeasor's equitable share is inconsistent with federal policy underlying Section 1983." 846 F.3d at 585. Further, a proportionate share reduction was inappropriate because, inter alia, the defendant did not request an instruction that the jury should determine the appropriate share of "settling" party's proportionate share of liability or consider the effect of a prior settlement when determining damages.

*Restivo* does not support Defendants' position. First, it found federal law deficient and New York' dollar for dollar set off as inconsistent with the purpose of §1983. As in *Restivo* Defendants did not request an instruction that the jury determine the appropriate share of the Settling Defendants liability; submitting a proposed verdict form addressing the issue without any accompanying proposed

request to charge is not sufficient. Finally, the jury in this case was instructed to assess damages "for any injury proximately caused by that defendant's conduct as it relates to the claims for which you found him liable" and that they could award compensatory damages "only for injuries plaintiff proves were proximately cause by a defendant's allegedly wrongful conduct." (DE at 49-50.)

In sum, Defendants are not entitled to a set-off or apportionment of damages.

## CONCLUSION

For the reasons set forth above, Defendants' motion pursuant to Fed. R. Civ. Pro 50 and 59 is granted to the extent that Defendants are granted a new trial on punitive damages unless Plaintiff accepts a reduced punitive damages award totaling $21,000.00; it is otherwise denied. Plaintiff shall advise the Court on or before September 12, 2019, whether he accepts the remittitur.

**SO ORDERED.**

Dated: Central Islip, New York
      August 22, 2019

    s/ Denis R. Hurley
Denis R. Hurley
United States District Judge